PIKE NATURAL GAS COMPANY, APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.
COLUMBIA GAS OF OHIO, INC., APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

(Nos. 81-191 and 81-635—Decided December 23, 1981.)

*Messrs. Gingher & Christensen* and *Mr. Robert H. Taylor,* for appellant Pike Natural Gas Co.

*Mr. Thomas E. Morgan, Mr. Roger C. Post* and *Mr. Thomas J. Brown, Jr.,* for appellant Columbia Gas of Ohio, Inc.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Mr. Harris S. Leven,* for appellee.

*Per Curiam.* The sole question before this court is the propriety of the commission's denials of the requested excise tax adjustment clauses.

Appellants argue that the commission's decisions are arbitrary, unreasonable and against the manifest weight of the evidence. These arguments are predicated upon a commission holding in a 1975 case which allowed the Dayton Power and

Light Company to include an adjustment clause similar to that presently under consideration. *In re Dayton Power & Light Co.* (February 20, 1975), No. 73-166-Y. In upholding the adjustment clause there, the commission reasoned that the company could not avoid the tax; the price of gas purchased was federally regulated; the increased state excise tax liability related to increased PGA levels had a significant impact on the company's return; and the company could in no way control the cost of this expense.[4]

Appellants argue that they presented sufficient evidence to meet the standard articulated by the commission in *Dayton Power & Light, supra.* Consequently, appellants argue, it was unreasonable and arbitrary for the commission to disallow the adjustment clauses here.

We do not reach appellants' contentions because, for reasons that follow, we hold that the commission would have exceeded its statutory authority had it approved the requested adjustment clause.

"[T]his court has consistently recognized that the Public Utilities Commission is a creature of the General Assembly and may exercise no jurisdiction beyond that conferred by statute." *Dayton Communications Corp.* v. *Pub. Util. Comm.* (1980), 64 Ohio St. 2d 302, 307. See, also, *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153, 166; *Werlin Corp.* v. *Pub. Util. Comm.* (1978), 53 Ohio St. 2d 76, 80; *Ohio Public Interest Group* v. *Pub. Util. Comm.* (1975), 43 Ohio St. 2d 175, paragraph five of the syllabus; *Penn Central Transportation Co.* v. *Pub. Util. Comm.* (1973), 35 Ohio St. 2d 97, paragraph one of the syllabus.

Thus, the commission could grant the requested adjustment clauses only if authorized by statute.

R. C. 4905.302 is the only statutory section which specifically authorizes the commission to implement an adjustment clause for use in the tariff of natural gas companies. R. C. 4905.302(C) requires the commission to adopt rules allowing purchased gas adjustment clauses to be included in natural gas companies' tariffs. "Purchased gas adjustment clause" is defined by R. C. 4905.302(A)(1) as follows:

---

[4] This court did not rule on the validity of the commission's ruling in *Dayton Power & Light.*

"(a) A provision in a schedule of a gas company or natural gas company that requires or allows the company to, without adherence to section 4909.18 or 4909.19 of the Revised Code, adjust the rates that it charges to its customers in accordance with any fluctuation in the cost to the company of obtaining the gas that it sells, that has occurred since the time any order has been issued by the public utilities commission establishing rates for the company pertaining to those customers;

"(b) A provision in an ordinance adopted pursuant to section 743.26 or 4909.34 of the Revised Code or Section 4 of Article XVIII of the Ohio Constitution with respect to which a gas company or natural gas company is required or allowed to adjust the rates it charges under such an ordinance in accordance with any fluctuation in the cost to the company of obtaining the gas that it sells, that has occurred since the time of the adoption of the ordinance."

It is apparent from the quoted language that R. C. 4905.302 provides solely for adjustment clauses that reflect fluctuations in the price of gas to a utility. By adopting R. C. 4905.302, the General Assembly did not authorize the commission to allow the use of excise tax adjustment clauses. So if their use is permitted, then some other section of R. C. Title 49 must be the source of the commission's power.

Notwithstanding the limited nature of R. C. 4905.302, the commission has asserted that while it is unwilling to exercise its discretion at present, R. C. 4905.31 sanctions its use of discretion to permit utilities to adopt such clauses.[5] R. C. 4905.31 reads, in pertinent part, as follows:

---

[5] In *In re Columbia Gas of Ohio, Inc. (Martins Ferry)*, (May 24, 1979), No. 77-1428-GA-AIR, the commission stated:

"Although Section 4905.31 Revised Code would apparently permit such an arrangement and the cost-based aspect of the proposal is attractive, the Commission is of the opinion that the excise tax surcharge should not be approved at this time. First, the proposed surcharge, although technically not a part of the PGA, still would have the effect of allowing recovery of the increased tax obligation associated with increases in the PGA. Thus the conventional argument against allowing the automatic pass-through of excise taxes in the PGA, that to do so diminishes the incentive for the company to avail itself of the least expensive source of supply, would still apply. Second, although the Commission is aware that similar arrangements have been approved in other jurisdictions, the Commission suspects that customer confusion and misunderstanding might well result if this new adjustment or surcharge were to appear on individual bills. Customer acceptance is, after all, a recognized principle in establishing

"Except as provided in section 4933.29 of the Revised Code, Chapters 4901, 4903, 4905, 4907, 4909, 4921, and 4923 of the Revised Code do not prohibit a public utility from filing a schedule or entering into any reasonable arrangement with another public utility or with its customers, consumers, or employees providing for:

"* * *

"(B) A sliding scale of charges, including variations in rates based upon stipulated variations in cost as provided in the schedule or arrangement;

"* * *

"(E) Any other financial device that may be practicable or advantageous to the parties interested. No such arrangement, sliding scale, minimum charge, classification, variable rate, or device is lawful unless it is filed with and approved by the public utilities commission."

In our opinion, R. C. 4905.31 does not invest the commission with the requisite authority.[6] The General Assembly has legislated in this area. It did not include a provision for excise tax adjustment clauses when it adopted R. C. 4905.302. Indeed, when the General Assembly passed R. C. 4905.302, it was aware that the commission was authorizing the use of excise tax adjustment clauses.[7] Also, prior to the enactment of

rate design. At a time when other adjustment clauses have come under heavy attack, the Commission deems it inadvisable to approve yet another pass-through provision. Finally, the Commission is reluctant to use relatively small cases of the type now before us as a vehicle for instituting a novel billing practice which could have industry-wide implications. Thus, the Commission directs that the state excise tax surcharge proposed by applicant be eliminated from the tariffs filed pursuant to this order."

In denying appellant's requested adjustment clauses, the commission relied upon *Martins Ferry.*

[6] This court has upheld rates which vary according to customer usage—*Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403—and utility conservation plans—*Cleveland* v. *Pub. Util. Comm.* (1980), 63 Ohio St. 2d 62—based upon the commission's grant of authority contained in R. C. 4905.31. See, also, Jordan & Schneier, NGPA and Ohio's Self-Help Program—The End or a New Beginning?, 10 Univ. of Tol. L. Rev. 932 (1979) (where the authors point out that R. C. 4905.31 provides a mechanism for the commission to approve individual contracts between gas companies and major users). However, this court has never interpreted R. C. 4905.31 as authorizing the use of adjustment clauses such as those presently under consideration.

[7] *Dayton Power & Light, supra,* was decided by the commission in 1975, while R. C. 4905.302 was not adopted until April 1976.

R. C. 4905.302, other jurisdictions had adopted statutes which allowed costs, such as increased taxes, to be immediately passed through. See, *e.g.,* Ill. Ann. Stat. Chapter 111 2/3, Section 36.

Additionally, were we to hold that R. C. 4905.31 permits the use of excise tax adjustment clauses, it would be difficult to deny adjustment clauses for any operating expenses, for just as excise taxes may increase, other non-fuel costs will increase. This could eliminate the regulatory framework, contained in R. C. 4909.15, that rates are to be based upon historic costs. We are unwilling to proceed down this "slippery slope" under the guise of interpreting R. C. 4905.31. See *State, ex rel. Utility Consumers Council of Missouri, Inc.,* v. *Public Service Comm.* (Mo. 1979), 585 S.W. 2d 41; *Wisconsin's Environmental Decade, Inc.,* v. *Public Service Comm.* (1978), 81 Wis. 2d 344, 260 N.W. 2d 712.

In recent years, the desirability of adjustment clauses for utilities has been under debate.[8] Those who favor adjustment clauses have argued that they are necessary because there is a lag between the time costs increase and the time those costs may be recovered through increased rates. This lag is caused by the lengthiness of the regulatory process. This regulatory lag is exacerbated in a period, such as the present, of escalating costs. This also puts pressure upon regulatory agencies due to the increased number of rate cases. Those with a contrary point of view argue that the use of adjustment clauses diminishes utilities' incentive to provide consumers with the least expensive product. Whether a given adjustment clause, based upon these or other factors, should be adopted is not a question for the commission, or for this court; rather, its resolution lies with the General Assembly. For natural gas companies the General Assembly has authorized the use of purchased gas adjustment clauses.

---

[8] The literature is replete with discussions of the pros and cons of adjustment clauses as a regulatory mechanism. See, *e.g.,* Leaffer, Automatic Fuel Adjustment Clauses: Time for a Hearing, 30 Case W. Res. L. Rev. 228 (1980); Carver, Developments in Regulation: Adjustment Clauses, 53 Denver L. J. 663 (1976); Warren, Regulated Industries' Automatic Cost of Service Adjustment Clauses: Do They Increase or Decrease Cost to the Consumer?, 55 Notre Dame Law 333 (1980); Schiffel, Electric Utility Regulation: An Overview of Fuel Adjustment Clauses, 95 Pub. Util. Fort. No. 13, 23 (June 19, 1975); Trigg, Escalator Clauses in Public Utility Rate Schedules, 106 U. of Pa. L. Rev. 964 (1958).

Accordingly, the orders of the Public Utilities Commission are affirmed.[9]

*Orders affirmed.*

CELEBREZZE, C. J., W. BROWN, SWEENEY, LOCHER, HOLMES, C. BROWN and KRUPANSKY, JJ., concur.

---

[9] Columbia also argues that in rejecting the excise tax adjustment clause, the commission did not make sufficient findings of fact to justify its determination. In light of our holding that the commission does not have the statutory authority to allow such clauses, this contention becomes moot.